UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| HOMERO RAMIREZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| AUSTIN J. DECOSTER | ) | |
| | ) | |
| and | ) | |
| | ) | |
| MAINE AG, LLC | ) | |
| | ) | |
| and | ) | |
| | ) | |
| DECOSTER, LLC | ) | SECOND AMENDED |
| | ) | COMPLAINT |
| and | ) | |
| | ) | |
| MAINE CONTRACT FARMING, | ) | |
| LLC | ) | JURY TRIAL DEMANDED |
| | ) | |
| and | ) | |
| | ) | |
| DOROTHY EGG FARMS, INC. | ) | |
| | ) | |
| and | ) | |
| | ) | |
| DOROTHY EGG FARMS, LLC | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CO-HEN EGG FARMS, LLC | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CO-HEN EGG FARMS, INC. | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CO-HEN EGG HATCHERY CORP. | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CO-HEN HATCHERY, INC. | ) | |
| | ) | |

1

and                                    )
                                       )
RADLO BROS., INC.                      )
                                       )
and                                    )
                                       )
RADLO FOODS, LLC                       )
                                       )
and                                    )
                                       )
MOUNTAIN HOLLOW FARMS, LLC             )
                                       )
          Defendants,                  )

NOW COMES Homero Ramirez ("Plaintiff") and files his First Amended Complaint against Austin J. ("Jack") DeCoster, Maine AG, LLC, DeCoster, LLC, Maine Contract Farming, LLC, Dorothy Egg Farms, Inc., Dorothy Egg Farms, LLC, Co-Hen Egg Farms, LLC, Co-Hen Egg Farms, Inc., Co-Hen Egg Hatchery Corp., Co-Hen Hatchery, Inc., Radlo Bros., Inc., Radlo Foods, LLC, and Mountain Hollow Farms, LLC, ("Defendants") as follows:

<u>PARTIES</u>

1.      Plaintiff is an individual and a resident of Lewiston, County of Androscoggin, State of Maine.

2.      Defendant Austin J. ("Jack") DeCoster ("DeCoster" or "Jack DeCoster") is an individual with a residence in Turner, County of Androscoggin, State of Maine.

3.      Defendant Maine AG, LLC is a Maine limited liability company with a principal place of business in Turner, County of Androscoggin, State of Maine.

4.      Defendant DeCoster, LLC is a Maine limited liability company with a principal place of business in Turner, County of Androscoggin, State of Maine.

5.      Defendant Maine Contract Farming, LLC is a Maine limited liability company with a principal place of business in Turner, County of Androscoggin, State of Maine.

2

6.     Defendant Dorothy Egg Farms, Inc., is a Maine corporation with a principal place of business in Winthrop, County of Kennebec, State of Maine.

7.     Defendant Dorothy Egg Farms, LLC, is a Maine limited liability company with a principal place of business in Winthrop, County of Kennebec, State of Maine.

8.     Defendant Co-Hen Egg Farms, LLC, is a Maine limited liability company with a principal place of business in Turner, County of Androscoggin, State of Maine.

9.     Defendant Co-Hen Egg Farms, Inc., is a Maine corporation with a principal place of business in Turner, County of Androscoggin, State of Maine.

10.     Defendant Co-Hen Egg Hatchery Corp. is a Maine corporation with a principal place of business in Turner, County of Androscoggin, State of Maine.

11.     Defendant Co-Hen Hatchery, Inc. is a Maine corporation with a principal place of business in Turner, County of Androscoggin, State of Maine.

12.     Defendant Radlo Bros., Inc. is a Massachusetts corporation doing business in Maine with a principal place of business in Turner, County of Androscoggin, State of Maine.

13.     Defendant Radlo Foods, LLC is a Massachusetts limited liability company doing business in Maine with a principal place of business in Turner, County of Androscoggin, State of Maine.

14.     Defendant Mountain Hollow Farms, LLC is a Maine corporation with a principal place of business in Turner, County of Androscoggin, State of Maine.

<u>STATEMENT OF JURISDICTION</u>

15.     Jurisdiction is conferred upon the Federal District Court because the Complaint arises under the Constitution and laws of the United States.  28 U.S.C.A. §1331.

<u>FACTS</u>

16.     Plaintiff Homero Ramirez ("Ramirez") was born in Mexico

17.    Ramirez's first language is Spanish and he has a limited ability to read or write English.

18.    Ramirez is 56 years old.

19.    During the years of 1986 to 1989, prior to working for DeCoster, Ramirez worked in Delaware and provided Mexican workers for various entities owned by Defendant Jack DeCoster in Maine.

20.    At some point in 1988 or 1989, Ramirez was approached by Jack DeCoster with an offer to come to Maine and assist DeCoster in hiring Mexican workers to work at DeCoster's egg farms.

21.    As the inducement to work for DeCoster, DeCoster orally offered Ramirez a salary and also to pay for Ramirez's home, his electric service and heating oil for his home and his health insurance.

22.    Ramirez came to Maine in 1989 and worked for DeCoster and the various entities under DeCoster's control as a plant supervisor for over twenty years, during which time, DeCoster paid him a salary, and DeCoster paid for Ramirez's home, his electric service and heating oil and his health insurance.

23.    Throughout his employment, during periods of illness, DeCoster continued Ramirez's salary and continued to pay for his electric service and heating oil for his home and his health insurance.

24.    During his entire employment of nearly 22 years, Ramirez worked for all of the entities named as Defendants in this action, all under the ownership and control of Jack DeCoster.

25.    Regardless of the name of the entity for whom Ramirez worked, at all times Ramirez was under the direct supervision and control of Jack DeCoster.

26.     Throughout Ramirez's employment, including the summer and fall of 2010, DeCoster, in front of Ramirez, repeatedly referred to Mexican workers as "stupid," and to white workers as "gringos" and "Jamochas."

27.     For over twenty years, Ramirez worked in an environment and culture that treats Mexican American workers as "stupid" and virtual slaves whose only value is their willingness to perform dangerous or demeaning tasks for DeCoster.

28.     Throughout Ramirez's employment, including the summer and fall of 2010, DeCoster, in front of Ramirez, frequently stated that he did not like working with non-Mexican workers because they were not willing to accept his authority and would not do whatever he asked as willingly as Mexican workers.

29.     Throughout Ramirez's employment, including the summer and fall of 2010, DeCoster, in front of Ramirez, demanded that Ramirez hire Mexican workers, whom DeCoster could control, and was expressly instructed not to hire non-Mexican workers whom he could not control.

30.     On numerous occasions throughout Ramirez's employment, Ramirez was required to perform humiliating, demeaning, and often dangerous tasks without necessary safety precautions, with other employees standing nearby watching, to demonstrate the ironclad authority of Jack DeCoster over Ramirez and his other Mexican employees, and the willingness of Mexican employees to submit to whatever treatment they get, no matter how demeaning or dangerous.

31.     As an example, DeCoster asked Ramirez to clean and oil large machinery during normal plant operations without shutting down the machinery, as required by safety regulations, in an effort to haze Ramirez.

32.     On occasion, when DeCoster was demonstrating his iron-clad authority by requiring Ramirez to perform humiliating work, other workers would offer to assist or perform the work, but DeCoster would refuse to let Ramirez have assistance.

33.     Non-Mexican workers were not required to perform humiliating, demeaning and dangerous work that was required of Mexican workers.

34.     Throughout Ramirez's employment, including the summer and fall of 2010, DeCoster, in front of Ramirez, made Ramirez the brunt of ethnic slurs and derogatory remarks and "jokes" about Ramirez's inability to read or write English.

35.     DeCoster routinely and repeatedly poked Ramirez hard on the chest with his hands and fingers.

36.     DeCoster made threatening statements or gestures, such as: (a) "We know where you live;" (b) "I'm going to take a 2-by-4 and hit you in the head," or (c) forming his fingers in the shape of a gun and pointing at Ramirez's head.

37.     When Ramirez reported work-related injuries, DeCoster instructed him not to seek medical attention and accused him of being a "baby."

38.     In the last five years, including the summer and fall of 2010, Ramirez was systematically stripped of his management authority and his former duties were passed on to a younger employee.

39.     In the summer and fall of 2010, in a deliberate attempt to force Ramirez to resign in order to give his job to a younger worker, Ramirez was hazed and bullied by DeCoster to such an extent that he suffered emotional and mental injuries, including post-traumatic stress disorder and severe depression and anxiety, and had to take a leave of absence for his health.

40.     As an example, at some time in August, 2010, DeCoster decided to downsize a crew that included Mexican and non-Mexican workers.  DeCoster took Ramirez into his office

and told him to "get rid of the gringos," including the crew boss, who DeCoster wanted to replace with a Mexican worker.  This was part of an ongoing conversation in which DeCoster told Ramirez that he wanted Mexican workers because they were willing to take abuse, perform dangerous tasks and would be less likely to speak up for themselves.

41.     In late September 2010, Ramirez was asked to find a replacement worker for a position at DeCoster's grain mill.  Ramirez hired a non-Mexican worker for the job.

42.     When Jack DeCoster found out that Ramirez had not hired a Mexican for this job, he called Ramirez and told Ramirez to meet DeCoster at the office in 5 minutes, in a belligerent, threatening voice, stating "you be there."

43.     When Ramirez went to the office, DeCoster yelled and screamed in Ramirez's face that he did not obtain the type of worker that DeCoster wanted.  DeCoster yelled: "What do I pay you for?  You know the type of people I want, Homero.  You get me what I want," meaning Mexican workers.

44.     In mid-September, the Defendants had an important visitor from Land of Lakes, Inc.  Ramirez had worked late into the night trying to make sure the plant was organized and spotless.

45.     In front of the visitor, DeCoster gave credit for Ramirez's work to a younger worker who had nothing to do with cleaning the plant.

46.     At one point during the visit, DeCoster walked quickly and deliberately into Ramirez with his body, so that Ramirez had to jump out of the way.  In spite of Ramirez's best efforts to avoid contact, DeCoster's body made contact with his body.

47.     On October 5, 2010, Ramirez left work in order to take two employees to their doctor for workers' compensation injuries.  While Ramirez was on this errand, he received a call

from DeCoster's second-in-command, Duke Goranites, who told Ramirez that DeCoster was angry and that Ramirez needed to call DeCoster when he returned.

48.     When Ramirez returned to work around 5:00 pm, he called DeCoster and was told in a threatening voice to "come to my office."

49.     Ramirez went to DeCoster's office in the evening of October 5, 2010 and was taken into a conference room where DeCoster and another supervisor, Duke Goranites, were sitting.  DeCoster was belligerent, repeatedly hitting the table with his finger and screaming, "You, Mister, are going to report to the office tomorrow and get a cubicle."  DeCoster said this knowing that Ramirez cannot read or write English and cannot do paperwork in English. Ramirez objected that he cannot read or write English.  DeCoster screamed: "I tell you what to do.  Do you have a problem?  You got to do what I tell you to do.  Do you understand?  You're going to do paperwork.  You got it, mister?"

50.     On the evening of October 5, 2010, as a result of the experience described in the preceding paragraphs and all of the past experience, Ramirez felt extreme anxiety and depression.

51.     After the meeting ended, he was walking past DeCoster's office and DeCoster told Ramirez, "I need a ride home.  Take me home."  At his request, Ramirez gave DeCoster a ride home and during the entire ride, DeCoster yelled at Ramirez.  Among other things, DeCoster repeatedly badgered Ramirez with the question, "Are you coming in tomorrow?"  Ramirez replied that he was not sure, because he was experiencing extreme feelings of anxiety and depression.  DeCoster kept yelling, "You need to tell me now!" during the entire car ride.

52.     Ramirez sought treatment for his stress-related injury, which included post-traumatic stress disorder, severe anxiety and depression, and, as a result of that injury, and on the instructions of his medical provider, did not return to work.

53.     Ramirez suffers symptoms related to severe anxiety and post-traumatic stress and depression including, but not limited to, nausea, diarrhea, cramping and loss of control of bowels, increased startle response, loss of self-esteem, panic attacks, headaches, sleeplessness, nightmares, racing heart, fits of uncontrollable crying, chest tightness, anhedonia, social anxiety, hyper-vigilance, impaired memory and concentration, irritability, and suicidal thoughts.

54.     Ramirez had no previous symptoms of a mental condition or injury.

55.     Ramirez notified his employer of a work-related mental stress injury.

56.     On October 28. 2010, Ramirez sent a letter to DeCoster asking for accommodation under the Family Medical Leave Act, the Americans with Disabilities Act, and Maine Human Rights Act.

57.     Shortly after giving notice of his injury, DeCoster stopped paying Rarmirez his salary and benefits.

58.     At some point in November or December of 2010, DeCoster stopped paying Ramirez's electric and gas bill and health insurance.

<u>INTEGRATED ENTERPRISE</u>

59.     During 2010 and before, Ramirez worked for all of the entities listed as Defendants in this Complaint.

60.     Part of Ramirez's responsibilities was to assist DeCoster in obtaining Mexican laborers for DeCoster's various facilities in Maine, Ohio, Iowa and Maryland, and providing housing and meeting other needs, and to make funeral arrangements in cases when Mexican employees were killed.

61.     Austin J. DeCoster, as an individual, is and was, the Plaintiff's employer for all purposes, including, but not limited to the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., as amended; 42 U.S.C.S. § 12101 et seq, 42 U.S.C. §1981, 29 U.S.C.

§§ 621-3, 29 U.S.C.A § 2614, 2615, the Maine Human Rights Act, and Maine Family Medical Leave Act.

62.     All of the entities listed as Defendants in this Complaint were the Plaintiff's employers, for all purposes, including, but not limited to, the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., as amended; 42 U.S.C.S. § 12101 et seq, 42 U.S.C. §1981, 29 U.S.C. §§ 621-3, 29 U.S.C.A § 2614, 2615, the Maine Human Rights Act, and Maine Family Medical Leave Act.

63.     Ramirez's paycheck came from the umbrella entity, Maine AG, LLC, which, upon information and belief, is the payroll entity for all of the entities listed as Defendants in this Complaint, and also Quality Egg of New England, LLC, Maine and Turner Maintenance and Services, Inc..

64.     All of the Defendants listed in this Complaint have an interrelation of operations, common management, centralized control of labor relations, and common ownership.

65.     Jack DeCoster has direct control of labor operations, employment decisions of all of the entities listed as Defendants in this Complaint.

66.     Defendant Maine AG, LLC has direct control of labor operations, employment decisions of all of the entities listed as Defendants in this Complaint.

67.     All of the Defendants listed in this Complaint make up an "integrated enterprise."

68.     In addition to the Defendants listed in this complaint, Decoster has direct control of labor operations, employment decisions of Quality Egg of New England, LLC, Maine and Turner Maintenance and Services, Inc., and additional businesses and entities in Ohio, Maryland and Iowa, including, but not limited to A.J. DeCoster Co., Iowa Ag, LLC, Iowa Ag-Construction Co., Inc., Decoster Farms, DeCoster Egg Farms, Midwest Hatchery and Poultry Farms, Inc.,

Hillandale Farms, Decoster Enterprises, Inc., Decoster Construction, Inc., Wright County Egg; Ohio Fresh Eggs, and other entities.

69.     Quality Egg of New England, LLC, Maine and Turner Maintenance and Services, Inc., and additional businesses and entities in Maryland, Iowa and Ohio owned and operated by Decoster have an interrelation of operations, common management, centralized control of labor relations, and common ownership.

70. All of the Defendants listed in this Complaint, Quality Egg of New England, LLC, Maine and Turner Maintenance and Services, Inc., and additional businesses and entities in Maryland, Iowa and Ohio owned and operated by Decoster, make up an "integrated enterprise."

<u>PROCEDURAL HISTORY</u>

71. By letter dated December 29, 2010, 6he Plaintiff filed a Complaint with the Maine Human Rights Commission and the Equal Employment Opportunity Commission against all Defendants for illegal discrimination based on race, national origin, age and disability.

72. After the expiration of 180 days from the filing of the charge the Maine Human Rights Commission issued a "right to sue" letter dated July 14, 2011, pursuant to 5 M.R.S.A. §§ 4612, 4622.  See **<u>Exhibit A</u>**.

<u>COUNT I</u>

<u>DEFENDANTS' VIOLATIONS OF TITLE VII'S PROHIBITION AGAINST EMPLOYMENT DISCRIMINATION BASED ON RACE – DISPARATE IMPACT</u>

73. Plaintiff repeats and realleges the allegations in paragraphs 1 through 66 as if fully set forth herein.

74. This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section(s) 2000e et seq., as amended, and 42 U.S.C. Section 1981, for relief based upon the unlawful employment practices of the above-named Defendants.

Specifically, Ramirez complains of Defendants' violation of Title VII's prohibition against discrimination in employment based, in whole or in part, upon an employee's race.

75. Ramirez is a Mexican American male and during his employment with Defendant Ramirez was a member of a class protected under Title VII against race based discrimination by his employer, Defendants, or its supervisory personnel.

76. At all relevant times, Ramirez fully, adequately and completely performed all of the functions, duties and responsibilities of his employment with Defendants.

77. At all relevant times, Defendants treated Mexican workers, including the Plaintiff, differently from non-Mexican workers.

78. At all relevant times, Defendants treated Mexican workers, including the Plaintiff, differently from non-Mexican workers by calling them "stupid" and other derogatory names.

79. At all relevant times, Defendants treated Mexican workers, including the Plaintiff, differently from non-Mexican workers by requiring them to perform humiliating and demeaning work.

80. At all relevant times, Defendants treated Mexican workers, including the Plaintiff, differently from non-Mexican workers by requiring them to perform dangerous work without adequate safety precautions.

81. The Defendants' employment practices negatively impacts minority employees in general and Mexican employees in particular on a company-wide basis.

82. The Defendants' above-described discriminatory conduct was deliberate and motivated by malice and/or reckless indifference to the Plaintiff.

83. As a result of Defendants' policies and practices, Ramirez was unjustly and discriminatorily deprived of equal employment opportunities because of his race.

<u>COUNT II</u>

<u>DEFENDANTS' VIOLATIONS OF TITLE VII'S PROHIBITION AGAINST EMPLOYMENT
DISCRIMINATION BASED ON RACE – HARASSMENT/HOSTILE WORK
ENVIRONMENT</u>

84. Plaintiff repeats and realleges the allegations in paragraphs 1 through 76 as if fully set forth herein.

85. This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section(s) 2000e et seq., as amended, and 42 U.S.C. Section 1981, for relief based upon the unlawful employment practices of the above-named Defendants. Specifically, Ramirez complains of Defendants violation of Title VII's prohibition against discrimination in employment based, in whole or in part, upon an employee's race.

86. Ramirez is a Mexican American male and during his employment with Defendant Ramirez was a member of a class protected under Title VII against race based discrimination by his employer, Defendants, or its supervisory personnel.

87. Ramirez was subjected to repeated incidents of name-calling, ethnic slurs, and bullying by DeCoster and his employers based on his race.

88. Ramirez was subjected to frequent "jokes" based on his inability to read or write English by DeCoster and his employers.

89. Ramirez was subjected to repeated incidents of threats, yelling, threatening, and screaming by DeCoster and his employers based on his race.

90. Ramirez was asked repeatedly to perform demeaning, humiliating and dangerous work without adequate safety precautions by DeCoster and his employers based on his race.

91. Ramirez was asked repeatedly to perform demeaning, humiliating and dangerous work without adequate safety precaution in front of other employers, and as an example to other Mexican employees, by DeCoster and his employers based on his race.

92. The harassment of Ramirez and other Mexican workers was severe and pervasive.

93. As a result of the above-described conduct and harassment, Ramirez and other Mexican employees were subjected to a hostile work environment.

94. The Defendants' above-described discriminatory conduct was deliberate and motivated by malice and/or reckless indifference to the Plaintiff.

95. As a result of Defendants' policies and practices, Ramirez was unjustly and discriminatorily deprived of equal employment opportunities because of his race.

<u>COUNT III</u>

<u>DEFENDANTS' VIOLATIONS OF TITLE VII'S PROHIBITION AGAINST EMPLOYMENT DISCRIMINATION BASED ON NATIONAL ORIGIN – DISPARATE IMPACT</u>

96. Plaintiff repeats and realleges the allegations in paragraphs 1 through 89 as if fully set forth herein.

97. This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section(s) 2000e et seq., as amended, and 42 U.S.C. Section 1981, for relief based upon the unlawful employment practices of the above-named Defendants. Specifically, Ramirez complains of Defendants violation of Title VII's prohibition against discrimination in employment based, in whole or in part, upon an employee's national origin.

98. Ramirez is a Mexican American male and during his employment with Defendant Ramirez was a member of a class protected under Title VII against national origin based discrimination by his employer, Defendants, or its supervisory personnel.

99. At all relevant times, Ramirez fully, adequately and completely performed all of the functions, duties and responsibilities of his employment with Defendants.

100.    At all relevant times, Defendants treated Mexican workers, including the Plaintiff, differently from non-Mexican workers.

101.    At all relevant times, Defendants treated Mexican workers, including the Plaintiff, differently from non-Mexican workers by threatening them, calling them "stupid," and other derogatory names.

102.    At all relevant times, Defendants treated Mexican workers, including the Plaintiff, differently from non-Mexican workers by requiring them to perform humiliating and demeaning work.

103.    At all relevant times, Defendants treated Mexican workers, including the Plaintiff, differently from non-Mexican workers by requiring them to perform dangerous work without adequate safety precautions.

104.    The Defendants' employment practices negatively impact minority employees in general and Mexican employees in particular on a company-wide basis.

105.    The Defendants' above-described discriminatory conduct was deliberate and motivated by malice and/or reckless indifference to the Plaintiff.

106.    As a result of Defendants' policies and practices, Ramirez was unjustly and discriminatorily deprived of equal employment opportunities because of his national origin.

<u>COUNT IV</u>

<u>DEFENDANTS' VIOLATIONS OF TITLE VII'S PROHIBITION</u>

<u>AGAINST EMPLOYMENT DISCRIMINATION BASED ON NATIONAL ORIGIN –</u>

<u>HARASSMENT/HOSTILE WORK ENVIRONMENT</u>

107.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 100 as if fully set forth herein.

108.    This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section(s) 2000e et seq., as amended, and 42 U.S.C. Section 1981, for relief based upon the unlawful employment practices of the above-named Defendants.  Specifically, Ramirez complains of Defendants violation of Title VII's prohibition against discrimination in employment based, in whole or in part, upon an employee's national origin.

109.    Ramirez is a Mexican American male and during his employment with Defendant Ramirez was a member of a class protected under Title VII against national origin based discrimination by his employer, Defendants, or its supervisory personnel.

110.    Ramirez was subjected to repeated incidents of name-calling, ethnic slurs, and bullying by DeCoster and his employers based on his national origin.

111.    Ramirez was subjected to frequent "jokes" based about his inability to read or write English by DeCoster and his employers.

112.    Ramirez was subjected to repeated incidents of yelling, threatening, and screaming by DeCoster and his employers based on his national origin.

113.    Ramirez was asked repeatedly to perform demeaning, humiliating and dangerous work without adequate safety precautions by DeCoster and his employers based on his national origin.

16

114.    Ramirez was asked repeatedly to perform demeaning, humiliating and dangerous work without adequate safety precaution in front of other employers, and as an example to other Mexican employees, by DeCoster and his employers based on his national origin.

115.    The harassment of Ramirez and other Mexican workers was severe and pervasive.

116.    As a result of the above-described conduct and harassment, Ramirez and other Mexican employees were subjected to a hostile work environment.

117.    The Defendants' above-described discriminatory conduct was deliberate and motivated by malice and/or reckless indifference to the Plaintiff.

118.    As a result of Defendants' policies and practices, Ramirez was unjustly and discriminatorily deprived of equal employment opportunities because of his national origin.

<u>COUNT V</u>

<u>DEFENDANTS' VIOLATIONS OF MAINE HUMAN RIGHTS ACT, 5 M.R.S.A. §§ 4551-4633- DISCRIMINATION BASED ON RACE</u>

119.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 112 as if fully set forth herein.

120.    The Maine Human Rights Act prohibits (a) overt acts of discrimination based on race, (b) disparate treatment based on race, and (c) disparate impact based on race.

121.    Ramirez is a Mexican male and, as such, belongs to a protected class based on his race, pursuant to the Maine Human Rights Act.

122.    At all relevant times, Ramirez fully, adequately and completely performed all of the functions, duties and responsibilities of his employment with Defendants.

123.    At all relevant times, Defendants treated Mexican workers, including the Plaintiff, differently from non-Mexican workers.

124.    At all relevant times, Defendants treated Mexican workers, including the Plaintiff, differently from non-Mexican workers by calling them "stupid" and other derogatory names.

125.    Ramirez was subjected to repeated incidents of name-calling, ethnic slurs, and bullying by DeCoster and his employers based on his race.

126.    Ramirez was subjected to frequent "jokes" based on his inability to read or write English by DeCoster and his employers.

127.    Ramirez was subjected to repeated incidents of yelling, threatening, screaming by DeCoster and his employers based on his race.

128.    Ramirez was asked repeatedly to perform demeaning, humiliating and dangerous work without adequate safety precautions by DeCoster and his employers based on his race.

129.    Ramirez was asked repeatedly to perform demeaning, humiliating and dangerous work without adequate safety precaution in front of other employers, and as an example to other Mexican employees, s by DeCoster and his employers based on his race.

130.    The harassment of Ramirez and other Mexican workers was severe and pervasive.

131.    At all relevant times, Defendants treated Mexican workers, including the Plaintiff, differently from non-Mexican workers by requiring them to perform humiliating and demeaning work.

132.    As a result of the above-described conduct and harassment, Ramirez and other Mexican employees were subjected to a hostile work environment.

133.    At all relevant times, Defendants treated Mexican workers, including the Plaintiff, differently from non-Mexican workers by requiring them to perform dangerous work without adequate safety precautions.

134.    The Defendants' employment practices negatively impacts minority employees in general and Mexican employees in particular on a company-wide basis.

135.   The Defendants' above-described discriminatory conduct was deliberate and motivated by malice and/or reckless indifference to the Plaintiff.

136.   As a result of Defendants' policies and practices, Ramirez was unjustly and discriminatorily deprived of equal employment opportunities because of his race.

<u>COUNT VI</u>

<u>DEFENDANTS' VIOLATIONS OF MAINE HUMAN RIGHTS ACT, 5 M.R.S.A. §§ 4551-4633 - DISCRIMINATION BASED ON NATIONAL ORIGIN</u>

137.   Plaintiff repeats and realleges the allegations in paragraphs 1 through 130 as if fully set forth herein.

138.   The Maine Human Rights Act prohibits (a) overt acts of discrimination based on race, (b) disparate treatment based on race, and (c) disparate impact based on national origin.

139.   Ramirez is a Mexican male and, as such, belongs to a protected class based on his national origin.

140.   At all relevant times, Ramirez fully, adequately and completely performed all of the functions, duties and responsibilities of his employment with Defendants.

141.   At all relevant times, Defendants treated Mexican workers, including the Plaintiff, differently from non-Mexican workers.

142.   At all relevant times, Defendants treated Mexican workers, including the Plaintiff, differently from non-Mexican workers by calling them "stupid" and other derogatory names.

143.   Ramirez was subjected to repeated incidents of name-calling, ethnic slurs, and bullying by DeCoster and his employers based on his national origin.

144.   Ramirez was subjected to frequent "jokes" based on his inability to read or write English by DeCoster.

145.    Ramirez was subjected to repeated incidents of yelling, threatening, and screaming by DeCoster and his employers based on his national origin.

146.    Ramirez was asked repeatedly to perform demeaning, humiliating and dangerous work without adequate safety precautions by DeCoster and his employers based on his national origin.

147.    Ramirez was asked repeatedly to perform demeaning, humiliating and dangerous work without adequate safety precaution in front of other employers, and as an example to other Mexican employees, by DeCoster and his employers based on his national origin.

148.    The harassment of Ramirez and other Mexican workers was severe and pervasive.

149.    At all relevant times, Defendants treated Mexican workers, including the Plaintiff, differently from non-Mexican workers by requiring them to perform humiliating and demeaning work.

150.    As a result of the above-described conduct and harassment, Ramirez and other Mexican employees were subjected to a hostile work environment.

151.    At all relevant times, Defendants treated Mexican workers, including the Plaintiff, differently from non-Mexican workers by requiring them to perform dangerous work without adequate safety precautions.

152.    The Defendants' employment practices negatively impacts minority employees in general and Mexican employees in particular on a company-wide basis.

153.    The Defendants' above-described discriminatory conduct was deliberate and motivated by malice and/or reckless indifference to the Plaintiff.

154.    As a result of Defendants' policies and practices, Ramirez was unjustly and discriminatorily deprived of equal employment opportunities because of his national origin.

<u>COUNT VII</u>

<u>AGE DISCRIMINATION</u>

<u>PURSUANT TO 29 U.S.C. §§ 621-34</u>

155.     The Plaintiff repeats and realleges the allegations in paragraphs 1 through 148 above as if fully set forth herein.

156.     The Plaintiff was fifty-five years old at the time his termination and over forty at all relevant times pertaining to the Complaint.

157.     The Plaintiff met the employers' legitimate expectations for performing his work; moreover, Defendants profited enormously from the Plaintiff's employment.

158.     The Defendants took an adverse employment action against the Plaintiff by terminating the Plaintiff's employment.

159.     The Defendant took an adverse employment action against the Plaintiff by giving him inconvenient and burdensome work requirements, in contrast to younger employees.

160.     The Defendant took an adverse employment action against the Plaintiff by discontinuing his pay and his benefits, including, the discontinuation of his pay, his health insurance, his electricity and oil to his home.

161.     The Defendant took an adverse employment action against the Plaintiff by bullying, harassing, yelling, screaming and ridiculing the Plaintiff.

162.     The Defendant took an adverse employment action against the Plaintiff by requiring him to perform humiliating and demeaning work and dangerous work without adequately safety precautions.

163.     The Defendant has transferred the Plaintiff's position and duties to a younger employee.

164.     The Defendant took all of the adverse employment actions against the Plaintiff as outlined above, because of Plaintiff's age.

165.    The Plaintiff experienced discrimination and harassment in his employment based on his age.

166.    There is a direct causal connection between the Plaintiff's age and the adverse actions described above.

167.    The Defendants' above-described discriminatory conduct was deliberate and motivated by malice and/or reckless indifference to the Plaintiff.

168.    The Defendant is liable to the Plaintiff for age discrimination.

<u>COUNT VIII</u>

<u>AGE DISCRIMINATION</u>

<u>PURSUANT TO 5 M.R.S.A. §§ 4551-4633</u>

169.    The Plaintiff repeats and realleges the allegations in paragraphs 1 through 162 above as if fully set forth herein.  The Plaintiff was fifty-five years old at the time his termination and over forty at all relevant times pertaining to the Complaint.

170.    The Plaintiff met the employer's legitimate expectations for performing his work; moreover, Defendants profited enormously from the Plaintiff's employment.

171.    The Defendants took an adverse employment action against the Plaintiff by terminating the Plaintiff's employment.

172.    The Defendant took an adverse employment action against the Plaintiff by giving him inconvenient and burdensome work requirements, in contrast to younger employees.

173.    The Defendant took an adverse employment action against the Plaintiff by discontinuing his pay and his benefits, including, the discontinuation of his pay, his health insurance, his electricity and oil to his home.

174.    The Defendant took an adverse employment action against the Plaintiff by bullying, harassing, yelling, screaming and ridiculing the Plaintiff.

175.    The Defendant took an adverse employment action against the Plaintiff by requiring him to perform humiliating and demeaning work and dangerous work without adequately safety precautions.

176.    The Defendant has transferred the Plaintiff's position and duties to a younger employee.

177.    The Defendant took all of the adverse employment actions against the Plaintiff as outlined above, because of Plaintiff's age.

178.    The Plaintiff experienced discrimination and harassment in his employment based on his age.

179.    There is a direct causal connection between the Plaintiff's age and the adverse actions described above.

180.    The Defendants' above-described discriminatory conduct was deliberate and motivated by malice and/or reckless indifference to the Plaintiff.

181.    The Defendant is liable to the Plaintiff for age discrimination.

182.    In addition to ordinary damages, Plaintiff is entitled to compensatory damages, including emotional pain and suffering, and punitive damages, as a result of the Defendants' discriminatory conduct.

<u>COUNT IX</u>

<u>DISABILITY DISCRIMINATION PURSUANT TO TITLE II</u>

<u>OF THE AMERICANS WITH DISABILITIES ACT SECTION 504</u>

<u>OF THE REHABILITATION ACT OF 1973</u>

183.    The Plaintiff repeats and realleges the allegations in Paragraphs 1 through 176 above as if fully set forth herein.

184.    The Defendants are covered entities pursuant to the Americans with Disability Act.

185.    The Plaintiff is a "qualified individual with a disability" as defined in 42 U.S.C. § 12131(2).

186.    The Plaintiff has been denied a benefit or a privilege.

187.    The Plaintiff's pursuit of disability benefits from the Defendants, and engagement of counsel for that purpose, constitutes a protected activity under the terms of the Americans with Disabilities Act. 42 U.S.C. § 12203(a).

188.    The Defendants illegally retaliated against The Plaintiff when they stopped payment of his salary and payment of his other benefits, including electricity and oil for his home and health insurance after he sought disability benefits from the Defendants, and retained counsel to pursue this issue with the Defendants.

189.    The Defendants illegally retaliated against Ramirez when they terminated his health insurance, leaving him without any means to pay for medication and counseling visits to treat his depression.

190.    The Defendants' termination of Ramirez's benefits occurred very shortly after he sought disability benefits and engaged counsel to inquire about disability benefits through the Defendants.

191.    The Defendants' treated the Plaintiff differently from other employees who take leave related to a work-related injury or illness.

192.    As stated above, the Defendants' actions were based on an illegitimate and retaliatory motive which violates federal law. 42 U.S.C.S. § 12101 et seq.

## COUNT X

## VIOLATION OF MAINE HUMAN RIGHTS ACT, 5 M.R.S.A. §§ 4551-4633 -

## DISCRIMINATION AND ADVERSE ACTION ON THE BASIS OF DISABILITY

193.    The Plaintiff repeats and realleges the allegations in paragraphs 1 through 186 above as if fully set forth herein.

194.    The Plaintiff's stress-related condition, which has been diagnosed and treated by medical professionals, constitutes a disability as defined by the Maine Human Rights Act, 5 M.R.S.A. § 4553(7-A).

195.    Pursuant to the terms of the Maine Human Rights Act, 5 M.R.S.A. §4551 et seq., the Defendants had a duty to reasonably accommodate the Plaintiff's disability, and to not discriminate or take adverse action against the Plaintiff because of his disability.

196.    The Defendants failed to reasonably accommodate the Plaintiff and took adverse action against the Plaintiff when they stopped paying the Plaintiff his salary and his benefits, including electricity and oil service to his home, while he was on leave seeking treatment for his mental condition, and then terminated his health insurance.

197.    The Defendants' failure to accommodate the Plaintiff's disability, and the Defendants' discrimination against the Plaintiff because of his disability, was intentional.

198.    As described above, the Defendants' actions constitute violations of the Maine Human Rights Act.

## COUNT XI

## DISABILITY DISCRIMINATION PURSUANT TO THE MAINE HUMAN RIGHTS ACT, 5

## M.R.S.A. §§ 4551-4633 - RETALIATION

199.    The Plaintiff repeats and realleges all of the allegations in paragraphs 1 through 192, as if fully stated herein.

200.    The Plaintiff's pursuit of disability benefits from The Defendants, and engagement of counsel for that purpose, constitutes a protected activity under the terms of the Maine Human Rights Act. 5 M.R.S.A. § 4633(1).

201.    The Defendants illegally retaliated against the Plaintiff when they terminated the Plaintiff's salary, and payment of benefits, including electric and oil service to his home, after he sought disability benefits from the Defendants, and retained counsel to pursue this issue with the Defendants.

202.    The Defendants illegally retaliated against the Plaintiff when they terminated his health insurance, leaving the Plaintiff without any means to pay for medication and counseling visits to treat his stress-related injury.

203.    The Defendants' termination of the Plaintiff occurred very shortly after he sought disability benefits and engaged counsel to inquire about disability benefits through the Defendants.

204.    As stated above, the Defendants' actions were based on an illegitimate and retaliatory motive which violates Maine law. 5 M.R.S.A. §4551 et seq.

<u>COUNT XII</u>

<u>VIOLATIONS OF MAINE FAMILY MEDICAL LEAVE ACT</u>

205.    The Plaintiff repeats and realleges all of the allegations in paragraphs 1 through 198, as if fully stated herein.

206.    The Plaintiff took leave from his job with the Defendants as a result of acute stress-related injury, including anxiety and depression, a serious health condition.

207.    Pursuant to 26 M.R.S.A. § 845, the Defendants were obligated to continue the Plaintiff's benefits, including disability benefits and health insurance benefits, while the Plaintiff was on leave.

208.     The Defendants interfered with and denied the Plaintiff's right to medical leave by discontinuing his pay and his benefits, including payment for electric and oil service to his home, shortly after he went out on leave.

209.     The Defendants unlawfully refused to provide the Plaintiff with disability benefits when he went on leave, and unlawfully terminated his health insurance shortly thereafter.

210.     As described above, the Defendants' actions constitute violations of the Maine Family Medical Leave Act, 26 M.R.S.A. § 845, 847.

<u>COUNT XIII</u>

<u>VIOLATIONS OF FEDERAL FAMILY MEDICAL LEAVE ACT</u>

211.     Plaintiff repeats and realleges all of the allegations in paragraphs 1 through 204 as if fully stated herein.

212.     The Plaintiff took leave from his job with the Defendants as a result of acute depression and anxiety, a serious health condition.

213.     Pursuant to 29 U.S.C.A. § 2614, the Defendants was obligated to continue The Plaintiff's benefits, including disability benefits and health insurance benefits, while the Plaintiff was on leave.

214.     The Defendants interfered with and denied the Plaintiff's right to medical leave by terminating his salary and his benefits, including payment of his electric and oil service for his home, shortly after he went out on leave.

215.     The Defendants unlawfully refused to provide the Plaintiff with disability benefits when he went on leave, and unlawfully terminated his health insurance shortly thereafter.

216.     As described above, the Defendants' actions constitute violations of the Federal Family Medical Leave Act, 29 U.S.C.A § 2614, 2615.

217.     Plaintiff demands a trial by jury in this matter.

27

WHEREFORE, Plaintiff requests judgment in his favor against all Defendants on all counts, an award of all appropriate damages, including, without limitation, penalties, compensatory damages, injunctive relief, emotional pain and suffering, and punitive damages, recovery of unpaid wages, back pay and front pay, and benefits, interest, costs of suit, attorney's fees, and additional amount as liquidated damages, and such other and further relief as this court deems just and proper; an award of all appropriate damages for his other claims and any additional order or relief as the Court may grant or order, and such other and further relief as is appropriate.

DATED at Lewiston, Maine, on June 26, 2012.


Respectfully submitted,

/s/ Benjamin R. Gideon
Benjamin R. Gideon, Esq., Bar No. 9419
Alicia F. Curtis, Esq., Bar No. 10033
Attorneys for Homero Ramirez

Berman & Simmons, P.A.
129 Lisbon Street
P.O. Box 961
Lewiston, Maine  04243-0961
207-784-3576

## CERTIFICATE OF SERVICE

I, Benjamin R. Gideon, attorney for Plaintiff Homero Ramirez, hereby certify that on the date listed below a copy of the Plaintiff's Second Amended Complaint was provided to all parties listed on the docket.

DATED at Lewiston, Maine on June 26, 2012.


Respectfully submitted,


/s/ Benjamin R. Gideon
Benjamin R. Gideon, Esq., Bar No. 9419
Alicia F. Curtis, Esq., Bar No. 10033
Attorneys for Homero Ramirez

Berman & Simmons, P.A.
129 Lisbon Street
P.O. Box 961
Lewiston, Maine  04243-0961
207-784-3576